UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Conservation Law Foundation, Inc., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT FOR DECLARATORY** |
| ) | **AND INJUNCTIVE RELIEF AND** |
| ) | **CIVIL PENALTIES** |
| Longwood Venues & Destinations, Inc., ) | |
| Wychmere Harbor Real Estate, LLC, ) | |
| Wychmere Shores Condominium Trust, ) | |
| Jeffrey M. Feuerman, Joseph F. McKenney, ) | |
| Barry J. Goldy, Beach Club Management, ) | |
| LLC, Harbor Club Management, LLC, ) | |
| Atlas Investment Group, LLC, and ) | |
| Wychmere Holdings Corp., ) | (Federal Solid Waste Disposal Act, |
| ) | 42 U.S.C. §§ 6901 to 6992k) |
| Defendants. ) | |
| ) | |

**INTRODUCTION**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal

Solid Waste Disposal Act, 42 U.S.C. §§ 6901 *et seq*. ("the Resource Conservation Recovery Act,"

or "RCRA"). Plaintiff Conservation Law Foundation, Inc. ("CLF") seeks declaratory judgment,

injunctive relief, and other appropriate relief to remedy violations of RCRA by Wychmere Harbor

Real Estate, LLC, Longwood Venues & Destinations, Inc., and Wychmere Shores Condominium

Trust, and its Trustees: Jeffrey M. Feuerman, Joseph F. McKenney, Barry J. Goldy, Beach Club

Management, LLC, Harbor Club Management, LLC, Atlas Investment Group, LLC, and

Wychmere Holdings Corp. (hereinafter, collectively "the Defendants").

1

2.      Section 4005(a) of RCRA prohibits "any solid waste management practice or disposal of solid waste which constitutes the open dumping of solid waste." 42 U.S.C. § 6945(a).

3.      Section 7002(a)(2) of RCRA authorizes action against any person whose solid waste disposal "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

4.      The Wastewater Treatment Facility ("WWTF") owned and/or operated by Defendants disposes and discharges solid wastes into the Wychmere Harbor and contributes solid wastes to Wychmere Harbor, Nantucket Sound, and the surrounding waters ("the Receiving Waters").

5.      Defendants' disposal of solid waste through the WWTF constitutes open dumping and presents an imminent and substantial endangerment to health and the environment in violation of RCRA.

## JURISDICTION AND VENUE

6.      Plaintiff brings this civil suit under the citizen suit provision of Section 7002 of the Resource Conservation Recovery Act ("RCRA"). 42 U.S.C. § 6972.

7.      This Court has subject matter jurisdiction over the parties and this action pursuant to Section 7002(A), 42 U.S.C. § 6972(a); 28 U.S.C. § 1331 (an action arising under the Constitution and laws of the United States); and 28 U.S.C. §§ 2201-2202 (declaratory judgment).

8.      This Court has personal jurisdiction over the parties because the parties' contacts and activities in Massachusetts gave rise to Plaintiff's claims.

9.      On April 5, 2019 Plaintiff notified Defendants of its intention to file suit for violations of RCRA, in compliance with statutory notice requirements under Section 7002 of RCRA, 42 U.S.C. § 6972(b), and the corresponding regulations at 40 C.F.R. § 254. Letter to the Defendants, from

2

Heather A. Govern, Esq., CLF (April 5, 2019) (hereinafter "April Notice Letter"). A true and accurate copy of Plaintiff's Notice Letter is appended as Exhibit 1.

10.    More than ninety days have elapsed since Plaintiff served the April Notice Letter on Defendants, during which neither the Environmental Protection Agency ("EPA") nor the Commonwealth of Massachusetts commenced action to redress the open dumping and imminent and substantial endangerment to health and the environment alleged in this complaint. 42 U.S.C. § 6972(b)-(c).

11.    Venue is proper in the U.S. District Court for the District of Massachusetts pursuant to Section 7002 of the Act, 42 U.S.C. § 6972(a), because the source of the violations is located within this judicial district.

## PARTIES

12.    Plaintiff CLF is a nonprofit, member-supported organization dedicated to protecting New England's environment.

13.    CLF is incorporated under the laws of Massachusetts with its principal place of business at 62 Summer Street, Boston, MA 02110.

14.    For over fifty years, CLF has worked to protect the health of New England's waterways, including addressing the significant water quality impacts of sewage pollution. CLF has a legacy of working to protect the waters of Cape Cod.

15.    CLF actively seeks federal and state agency implementation of the Resource Conservation Recovery Act and, where necessary, directly initiates actions on behalf of itself and its members.

16.    CLF has over 5,100 members, including more than 2,900 members in Massachusetts. CLF members use and enjoy New England's waterways for recreational and aesthetic purposes, including boating, swimming, fishing, hunting, and sightseeing.

17.    The waters, landscapes, and natural resources used and enjoyed by CLF's members include, but are not limited to, the environments and waters of the United States adversely affected by Defendants' open dumping and solid waste disposal.

18.    The Wychmere Beach Club is an exclusive club and event space located at 23 Snow Inn Road in Harwich Port, MA 02646 on the shore of the Wychmere Harbor Channel.

19.    The Resort offers guest room accommodations, food and beverage service, and recreational activities.

20.    The Club includes a 650-seat restaurant, 25 hotel rooms, 100 pool lockers, 6 Channel House bedrooms, and 79 condominium unit bedrooms (in 23 units).

21.    Club amenities also include a private beach, two outdoor heated swimming pools, eleven tennis courts, two restaurants, a bar, a fitness center, and a children's summer camp. *See Wychmere Beach Club*, www.wychmerebeachclub.com (last accessed July 21, 2019).

22.    Room and suite prices range from approximately $385 to $950 per night, while the cottage rents from $1,300 to $2,300 per night. *See Wychmere Beach Club*, www.wychmerebeachclub.com (last accessed August 2, 2019).

23.    Defendants also own and operate two (2) condominium towers at 23 Snow Inn Road in Harwich Port (Sound View Condominium and Wychmere Shores), which are served by the same Wastewater Treatment Facility as the rest of the property.

24.    Defendants own and operate the WWTF.

## STATUTORY AND REGULATORY BACKGROUND

25.    The Resource Conservation Recovery Act "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996).

4

26.     One of RCRA's primary objectives is to "prohibit[ ] future open dumping on the land and requir[e] the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health . . . ." 42 U.S.C. § 6902(a)(3).

27.     Section 4005(c) of RCRA, 42 U.S.C. 6945(a), prohibits "any solid waste management practice or disposal of solid waste which constitutes the open dumping of solid waste."

28.     Section 1004(14) of RCRA, 42 U.S.C. § 6903(14), defines "open dump" as "any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under [§ 6944] of this title which is not a facility for disposal of hazardous waste."

29.     Congressional findings enumerated at Section 1002(b)(4) of RCRA, 42 U.S.C. § 6901(b) found that "open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land . . . ."

30.     Section 4004(a) of RCRA, 42 U.S.C. § 6944(a), precludes from classification as sanitary landfill any facility presenting a "reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility."

31.     Section 1004(27) of RCRA, 42. U.S.C. §6903(27), defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, or other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved materials in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33 . . . ."

32.    Environmental Protection Agency (EPA) implementing regulations further define solid waste as " . . . any discarded material not excluded . . . " under the regulations. 40 C.F.R. § 261.2(a)(1).

33.    EPA implementing regulations exclude from the definition of solid waste " (i) domestic sewage; and (ii) [a]ny mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment . . . ." 40 C.F.R § 261.4(a)(1).

34.    EPA implementing regulations define domestic sewage as "untreated sanitary wastes that pass through a sewer system." 40 C.F.R. § 261.4(a)(1).

35.    EPA implementing regulations define "discarded" as "any material which is . . . [a]bandoned . . . [r]ecycled . . . or [c]onsidered inherently waste-like . . . ." 40 C.F.R. 261.2(a).

36.    EPA implementing regulations consider material "abandoned" when "[d]isposed of . . . [b]urned or incinerated . . . [or a]ccumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated . . . ." 40 C.F.R. 261.2(b).

37.    Section 1004(3) of RCRA, 42 U.S.C. § 6903(3), defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

38.    The plain meaning definition for "discharge" is "to send out a substance, esp[ecially] waste matter." *See* Cambridge Dictionary, "Discharge" (Last Accessed July 22, 2019), available at https://dictionary.cambridge.org/us/dictionary/english/discharge.

39.    Section 7002(a)(1) of RCRA, 42 U.S.C. § 6972(a)(1)(A), provides a citizen suit right of action against "any person . . . who is alleged to be in violation of any permit, standard, regulation,

6

condition, requirement prohibition, or order which has become effective pursuant to [the Resource Conservation Recovery Act] . . . .”

40.    Actions under Section 7002(a)(1) of RCRA expressly include those seeking remedies for violations of RCRA's open dumping prohibition. 42 U.S.C. § 6945(a).

41.    Each separate RCRA violation enforceable under 42 U.S.C. § 6972(a)(1)(A) subjects the violator to a civil penalty of up to $25,000 per violation, per day. 42 U.S.C. § 6928(g).

42.    Section 7002(a)(2) of RCRA, 42 U.S.C. § 6972(a)(1)(B), states: “any person may commence a civil action on his own behalf . . . against any person . . . and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . .”

43.    This Court may “award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever [this] Court determines such an award is appropriate.” 42 U.S.C. 6972(e).

## FACTS

### The Wastewater Treatment Facility

44.    Defendants have owned and / or operated the Wastewater Treatment Facility (“WWTF”) since at least 2013 through the present.

45.    The WWTF consists of a collection of pipes and pumps, a treatment system or systems, and a leach pit which disperses treated wastewater through subsurface pipes into the soil and groundwater.

46.    The WWTF collects and conveys sewage and wastewater from buildings and facilities owned and operated by Defendants.

47.    The WWTF discharges wastewater into the soil and groundwater, where it flows a short distance with groundwater before subsequently discharging into the Receiving Waters.

48.    Nitrogen, sewage, and contaminated groundwater comprise some of the solid waste constituents in the wastewater disposed of by Defendants and ultimately discharged into the Receiving Waters.

49.    Raw sewage is conveyed through collection pipes to the treatment component of the WWTF.

50.    Defendants' wastewater is pumped into a distribution box that splits the flow into three 22,000-gallon anoxic tanks. In the facility's anoxic tanks, nitrates are converted to nitrogen gas through a biological denitrification process. The tanks also allow the removal of settleable solids. The anoxic tanks overflow into a 36,000-gallon equalization tank.

51.    Defendants' wastewater is then pumped from the equalization tank into two Rotating Biological ("RBC") reactors. The RBC reactors convert ammonia to nitrates through the nitrification process.

52.    After leaving the RBC reactors, part of Defendants' wastewater recycles back to the Anoxic tanks, and the remainder moves on to one of two secondary clarifiers.

53.    After passing through the treatment area of the WWTF, wastewater is disposed of through pipes discharging into the leaching pits.

54.    The Defendants make no further use of and take no further action with their wastewater after its discharge and disposal into the leaching pits.

55.    The leaching pits are a soil absorption system.

56.    Soil absorption systems are designed to allow a planned release of contaminants into the groundwater. *See* U.S. EPA, *Decentralized Systems Technology Fact Sheet: Septic Tank – Soil Absorption Systems*, at 4 (Sept. 1999), https://www.h-gac.com/community/water/ossf/DSTFS_Sepetic-Tnak_Soil-Absorption-Systems.pdf.

57.    The area of the leaching pits consists of a network of large trenches containing gravel covered with a layer of soil that is approximately 180 feet long and 90 feet wide.

58.    The leaching pits are designed to discharge collected and treated wastewater into the soil and groundwater.

59.    The leaching pits discharge solid waste into the soil and groundwater.

60.    The WWTF can discharge 40,000 gallons of sewage into the leaching pits each day.

61.    The WWTF is not a sanitary landfill as defined at Section 4004(a) of the Resource Conservation Recovery Act, 42 U.S.C. § 6944(a).

62.    The WWTF is not a hazardous waste disposal facility.

63.    Solid waste is disposed into the leaching pits and subsequently discharged into groundwater hydrologically connected to the Wychmere Harbor.

64.    Solid waste disposed into and discharged through the leaching pits includes (i) sewage; (ii) contaminated groundwater; and (iii) nitrogen from sanitary waste.

65.    Wastewater disposed into and discharged through the leaching pits into the surrounding soil and groundwater violates RCRA's open dumping prohibition.

66.    Solid waste disposed into and discharged through the leaching pits presents a substantial and imminent endangerment and adverse effects on health or the environment.

**Defendants' Disposal of Solid Waste**

67.    Solid waste that is disposed of through the WWTF includes, but is not limited to, nitrogen (which may be present in the form of ammonia, nitrate, nitrite, and / or Total Kjeldahl Nitrogen ("TKN")), solids, chloride, organic material (as measured by biochemical oxygen demand), oil, and grease.

68.    Defendants have continuously disposed of nitrogen through the WWTF into the surrounding environment since 2013.

69.    Data submitted by Defendants to the Massachusetts Department of Environmental Protection ("MassDEP") show that total nitrogen discharge levels are regularly reported at concentrations reaching at least 34.16 mg/L.

70.    Additional constituents in Defendants' sewage and wastewater discharges may include ammonium, additional nutrients causing or contributing to eutrophication of downstream waters including other nitrogenous molecules, organic material and other wastes that create chemical and biological oxygen demand in receiving waters, bacteria, viruses, heavy metals, substances that alter soil and groundwater pH, and a variety of pharmaceuticals: drugs, medications, antibiotics, and hormones.

71.    Many constituents listed in the preceding count are endocrine disrupting chemicals, including nonylphenol, octylphenol, and some of their ethoxylated chains, 17β-estradiol, estriol, 17α-Ethynylestradiol, and bisphenol-A.

72.    Endocrine disrupting chemicals substantially and imminently endanger the aquatic organisms of the local environment.

73. Defendants have disposed of solid waste into the leaching pits, Wychmere Harbor, and the Receiving Waters in contravention of RCRA's open dumping prohibition each day of the five years preceding the date of the Notice Letter.

**Harm to the Environment**

Eutrophication and Nutrient Impairment

74. The WWTF is located approximately 180 feet from the Wychmere Harbor shore, and less than 160 feet from the channel that connects the Harbor to Nantucket Sound.

75. Groundwater beneath and surrounding the leaching pits is hydrologically connected to the Receiving Waters.

76. Groundwater beneath and surrounding the leaching pits flows through the Wychmere Harbor, Harbor Channel, and Receiving Waters.

77. Solid waste-carrying groundwater beneath and surrounding the leaching pits flows at an average rate of one foot per day through sandy, glacial outwash.

78. Solid waste-carrying groundwater beneath the leaching pits discharges into the Receiving Waters in 45 days to 223 days, depending on the pathway.

79. Groundwater elevations beneath the leaching pits are less than 10 feet above mean sea level. Groundwater elevations are approximately 20 feet above mean sea level northwest of the leaching pits, sloping gradually downward to the east and south.

80. Solid waste discharged from and through the WWTF enter the Receiving Waters via these hydrological connections.

81. Wychmere Harbor is an estuary connected to Nantucket Sound and the Atlantic Ocean by the Harbor Channel.

82.    Wychmere Harbor is impaired for nutrients, moderately impaired for dissolved oxygen, significantly to severely impaired for benthic fauna, and moderately impaired for macroalgae. *See* Mass. Exec. Office of Energy & Envtl. Affairs, Mass. Dep't of Envtl. Prot., & Bureau of Water Res., *FINAL Allen, Wychmere and Saquatucket Harbors and Embayment Systems TMDL for Total Nitrogen*, at 4, 8 (Feb. 2016), https://www.mass.gov/files/documents/2016/08/xi/tmdl-harwich.pdf.

83.    In or around 2016, upon the completion of the Total Maximum Daily Load (TMDL) process, Wychmere Harbor was found to be impaired for nutrients. *See FINAL Wychmere TMDL*, at ii. Wychmere Harbor will soon be added to the list of impaired waters developed by Massachusetts pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), for eutrophication impairment due to excessive nitrogen loading. *Id.*

84.    When water contains high levels of nitrogen, algae and aquatic plant concentrations reach densities that overwhelm natural ecosystem functions, a state known as eutrophication.

85.    Excessive nitrogen loading has pushed Wychmere Harbor beyond its critical threshold for nitrogen, contributing to eutrophication. *See FINAL Wychmere TMDL*, at 1.

86.    Total nitrogen loads in Wychmere Harbor are 17.93 kg N/day, with a resultant nitrogen concentration of 0.530-0.812 mg/L. *See FINAL Wychmere TMDL*, at vi.

87.    Wychmere Harbor nitrogen concentrations must decrease to 0.50 mg/L and total watershed loading must decrease to 0.66 kg of nitrogen/day in order to restore the Harbor's water and habitat quality. *Id*. at vi, 20.

88.    The Massachusetts Estuaries Project has proposed complete elimination of this septic system load to further achieving the Wychmere Harbor TMDL. *See* Mass. Estuaries Project *Watershed Report: Lower Cape: Wychmere Harbor,* at 1, 3-4 (Oct. 2017),

http://www.capecodcommission.org/resources/208/watershedreports/2017_Watershed_Report_L C_Wychmere_Harbor.pdf; *See FINAL Wychmere TMDL*, at 11, 19, 28.

89.     Excessive nitrogen worsens Wychmere Harbor's impairment.  This environmental impact has caused and will continue to cause drastic reductions of commercial and recreational uses in Wychmere Harbor. *See FINAL Wychmere TMDL*, at 7.

90.     Wychmere Harbor's excessive nitrogen is evidenced through undesirable macroalgae increases, periodic extreme decreases in dissolved oxygen concentrations that threaten aquatic life, and reductions in the diversity of benthic animal populations. *Id.* at iii, 4, 7, 8.

91.     The eutrophic Wychmere Harbor is marked by its dissolved oxygen levels, nutrient loading, aesthetics (including scum and objectionable odor, color, taste, or turbidity), and excess plant biomass and nuisance vegetation. *Id.* at 11.

92.     In eutrophic waters, an unhealthy amount of plants, algae, organic matter, and ammonia use up increasingly disproportionate amounts of dissolved oxygen in the water, causing oxygen depletion or hypoxia (low oxygen levels) and turbid water thick with plants and algae.

93.     Hypoxia can harm or kill fish and shellfish, decreasing the diversity and quantity of these animals.

94.     Shellfish are particularly susceptible to hypoxia because they cannot swim away when the oxygen levels become dangerously low. Under stressful conditions, benthic (ocean-floor) communities die, leaving behind only the most stress-tolerant species.

95.     The eutrophic Wychmere Harbor suffers from nuisance macro-algae populations and increased concentrations of phytoplankton and epiphyton (mats of organisms, including algae, cyanobacteria, and microbes which grow on other plants) which impair and substantially endanger the Harbor's ecology. *Id*. at 1.

96.    High nutrient loads in groundwater and watershed runoff risk exacerbating the Harbor's eutrophication.. *Id.* at 3.

97.    Unless Wychmere Harbor's excessive nitrogen levels are reduced, the severity of the Harbor's environmental impairments may increase. These more severe impairments may include periodic fish kills, reduction of the Harbor's benthic communities to its most stress-tolerant species, or a near loss of benthic animal communities. *Id.*

Fecal Coliform Harm

98.    In or around 2016, Wychmere Harbor was added to the list of impaired waters developed by Massachusetts under section 303(d) of the CWA (33 U.S.C. § 1313(d)) for fecal coliform impairment. *See* Mass. Exec. Office of Energy & Envtl. Affairs, Mass. Dep't of Envtl. Prot., & Bureau of Water Res., Mass. Dep't of Envtl. Prot., *Proposed Massachusetts Year 2016 integrated List of Waters*, 163 (June 2016), http://www.mass.gov/eea/docs/dep/water/resources/07v5/16ilwplist.pdf.

99.    Fecal coliform is a bacteria present in the large intestine that aids with food digestion and is found in feces. While fecal coliform is usually not harmful, its presence indicates water source contamination by fecal material containing other more dangerous (and more difficult to detect) viruses or bacterium. *See Coliform Bacteria in Drinking Water Supplies*, N.Y. State Dep't of Health, http://www.health.ny.gov/environmental/water/drinking/coliform_bacteria.htm (last accessed August 2, 2019).

100.    The presence of fecal coliform in Wychmere Harbor is further evidence of sewage contamination in the Harbor.

101.    The presence of sewage contamination, fecal material, and other more dangerous viruses and bacterium present a substantial and imminent endangerment to all people who enjoy the Wychmere Harbor and surrounding environment, including many of CLF's members.

102.    Parts of Nantucket Sound are also eutrophic and have been exhibiting low levels of dissolved oxygen and toxic algae and phytoplankton blooms as a result of excessive nutrient pollution.

103.    Defendants' WWTF is not a sanitary landfill under criteria promulgated pursuant to Section 4004 of RCRA, 42 U.S.C. § 6944(a).

### Harm to Plaintiff's Members

104.    Cape Cod's beautiful waters, shorebirds, and marine wildlife attract many CLF members to its shores.

105.    CLF members and their families use the Receiving Waters to swim, sail, canoe, kayak, waterski, fish, and harvest shellfish; others enjoy observing animals from the benches or looking out at the water.

106.    Defendants' past, present, and ongoing open dumping and solid waste disposal has and will continue to adversely affect CLF members' use and enjoyment of Wychmere Harbor and the Receiving Waters.

107.    Defendants' disposal and discharge of solid waste into Wychmere Harbor (and the Receiving Waters) causes and contributes to nitrogen pollution, eutrophication, and impairment of the Receiving Waters, harming CLF members' ability to recreate in and near the Receiving Waters and decreasing their enjoyment of beach and water activities

108.    Excessive nitrogen in coastal embayment systems like the Wychmere Harbor (and the Receiving Waters) has a devastating effect on the natural ecosystem and harms CLF members.

109.   High nitrogen levels cause algal blooms and red tides, phenomena that occur when toxin-producing algae grow in out-of-control amounts.

110.   Algal blooms and red tides are harmful to both animal and human water-users, frequently causing fish kills, unpleasant odors and scums, and beach closures.

111.   Excessive algae, including algal blooms and red tides, are aesthetically unappealing, as they decrease water clarity and cover the water in a film of green, blue green (alternatively "cyanobacteria"), brown, or red algae.

112.   Studies have found correlations between cyanobacteria exposure and human neurodegenerative diseases.

113.   CLF members and their families, who used to enjoy swimming and boating in the Receiving Waters, now find recreating in the algae-and plant-choked waters much less enjoyable.

114.   CLF members care about the natural environment of the Receiving Waters, and they worry that high nitrogen levels have damaged and will continue to damage Wychmere Harbor's ecosystem and irreparably harmed local fish and scallop populations.

115.   CLF members with fond memories of harvesting five different species of shellfish in the Receiving Waters no longer harvest shellfish at all due to concerns about pollution and the loss of all but one species of mollusk.

116.   The harmful algae blooms and red tides that accompany eutrophication threaten the ability of CLF members to swim in and boat on the Receiving Waters.

117.   CLF members who enjoy looking out at the Receiving Waters prefer them to have a clear, algae-free appearance. When the Harbor water is covered with algae and clouded by organic matter, or gives off unpleasant odors, CLF members cannot fully enjoy the waters.

16

118.   CLF members and their families worry that swimming in waters subjected to Defendants' open dumping and harmful solid waste disposal presents a substantial and imminent endangerment to human health.

119.   CLF members are concerned that Defendants' continuing unauthorized solid waste discharge and disposal has previously and is actively contributing to the present eutrophication of these waters and will further damage these waters which are already substantially impaired.

120.   Defendants' open dumping and solid waste disposal has contributed and continues to contribute to a substantial and imminent endangerment to the health of all those in the area, including CLF members and their families.

121.   Defendants' failure to comply with RCRA's open dumping prohibition has contributed and continues to contribute to a substantial and imminent endangerment to CLF member health and to residential, recreational, and natural environments enjoyed by CLF members.

122.   The Court can redress the injuries suffered by CLF members by ordering Defendants' compliance with RCRA's open dumping prohibition and by ordering any other necessary relief.

123.   The relief sought will redress the Plaintiff's injuries by restoring water and environmental quality to a level consistent with CLF members' use and enjoyment of Wychmere Harbor, the Receiving Waters, and the surrounding environment.

124.   The unlawful acts described herein are ongoing and continuous and irreparably harm CLF members, for which harm they have no plain, immediate, or adequate remedy at law.

## CLAIMS FOR RELIEF

### First Cause of Action:
### Unlawful Practice and Disposal of Solid Waste

125.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

17

126.   Section 4005(a) of the Resource Conservation Recovery Act, 42 C.F.R. 9645(a), prohibits "any solid waste management practice or disposal of solid waste which constitutes the open dumping of solid waste."

127.   The WWTF is an open dump.

128.   Defendants' disposal of solid waste through their WWTF violates RCRA's open dumping prohibition.

129.   Solid waste disposed through the WWTF contains harmful constituents presenting a greater than reasonable probability of adverse effects on health or the environment. 42 C.F.R. § 6944(a).

130.   Each day in which Defendants dispose solid waste through the WWTF in violation of RCRA's open dumping prohibition constitutes a separate and distinct violation of Section 4005(a) of the Resource Conservation Recovery Act, 42 U.S.C. § 6945(a).

**Second Cause of Action:**
**Defendants' Contributions Present an Imminent and Substantial Endangerment to Health and the Human Environment**

131.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

132.   Section 7002(a)(2) of RCRA, 42 U.S.C. § 6972(a)(1)(B), provides, in relevant part:

> [A]ny person may commence a civil action on his own behalf . . . against any person, including . . . any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . ."

133.   Defendants have and continue to dispose of solid waste, including (i) sewage, (ii) contaminated groundwater, and (iii) nitrogen from sanitary waste.

134.   As the parties responsible for the WWTF, and as owners and operators of the Club, the parties "ha[ve] contributed to" and "[are] contributing to the past or present handling, storage, treatment, transportation, or disposal . . . " of solid waste under RCRA. 42 U.S.C. § 6972(a)(1)(B).

135.   Defendants' solid waste disposal presents an imminent and substantial endangerment to health and the environment.

## RELIEF REQUESTED

136.   Plaintiff respectfully requests that this Court grant the following relief:

   a.  Declare Defendants to have violated and to be in violation of Section 4005(a) of the Resource Conservation Recovery Act, 42 U.S.C. 42 U.S.C. § 6945(a), for their discharge and disposal of solid waste in contravention of RCRA's open dumping prohibition;

   b.  Enjoin Defendants from discharging and disposing of solid waste through their WWTF;

   c.  Order Defendants to relocate their sewage or improve their WWTF such that future operation will not result in the discharge and disposal of solid waste;

   d.  Order Defendants to reduce future nitrogen discharge to a level commensurate with modern denitrification technologies, which can reduce concentrations to the 2-3 mg/L range.

   e.  Order Defendants to take other appropriate actions and remedy the harm caused by their solid waste disposal and violation of RCRA;

   f.  Order Defendants to pay civil penalties of up to $ 25,000 per violation per day for all RCRA Section 4005(a) violations;

g.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, and

consultant fees) as permitted by Section 7002(e) of RCRA, 42 U.S.C. § 6972(e);

h.   Award any such other and further relief as the Court may deem appropriate.

## JURY DEMAND

137.   Plaintiff does not request a jury trial.

Dated: August 2, 2019                      Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.,

By its Attorneys:

*/s/ Heather Govern*
Heather Govern, Esq., BBO# 688482
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1765
hgovern@clf.org


*/s/ Christopher M. Kilian*
Christopher M. Kilian, Esq.
*Admitted Pro Hac Vice*
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992 x4015
ckilian@clf.org

20